# EXHIBIT B

CPY

Edward S. Zusman (SBN 154366)
Kevin K. Eng (SBN 209036)
MARKUN ZUSMAN FRENIERE & COMPTON LLP
465 California Street, Suite 401
San Francisco, CA 94104
Telephone: (415) 438-4515
Facsimile: (415) 434-4505
ezusman@mzclaw.com
keng@mzclaw.com

Robert W. Cohen (SBN 150310)
Mariko Taenaka (SBN 273895)
LAW OFFICES OF ROBERT W. COHEN, P.C.
1901 Avenue of the Stars, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 282-7586
Facsimile: (310) 282-7589
rwc@robertwcohenlaw.com
mt@robertwcohenlaw.com

Attorneys for Plaintiffs

FILED
Superior Court of California
County of Los Angeles

FEB 28 2020

Sherri R. Carter, Executive Officer/Clerk

STEVEN DREW

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

| LAURELWOOD CLEANERS, LLC, | Case No. **20STCV07952** |
|---|---|
| Plaintiff, | **COMPLAINT FOR PUBLIC INJUNCTION** |
| v. | (1) Unlawful Business Practice in violation of Bus. & Prof. Code § 17200 et seq. |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES CO. INC., | (2) Violation of Cartwright Antitrust Act, Bus. & Prof. Code § 16700 et seq. |
| Defendants. | **By Fax** |

1

COMPLAINT FOR PUBLIC INJUNCTION

For its complaint, plaintiff Laurelwood Cleaners, LLC alleges as follows:

## INTRODUCTION

1. This action seeks a public injunction restraining defendants American Express Co. and American Express Travel Related Services Co., Inc. (together, "American Express" or "Amex") from maintaining rules that compel Amex-accepting merchants to offer their customers the service of Amex-card acceptance for free. Every time the merchant swipes an Amex-branded card, American Express charges the merchant a price for the service of Amex-card acceptance. This price is calculated as a percentage of the transaction amount. But American Express' rules mandate that the merchant must, in turn, offer this service of Amex-card acceptance to its customers for zero dollars. Therefore, American Express's rules constitute vertical price restraints that are *per se* illegal under California antitrust law. And even if "rule of reason" analysis were applicable, Amex's restraints would fail the "quick look" test that would apply under well-settled California law.

2. In addition to rescinding the so-called "No-Surcharge Rule," which bans merchants from charging a price for processing Amex transactions, the public injunction sought here would prohibit Amex from enforcing rules that bar merchants from offering discounts for using competing products, including rival credit cards that are cheaper to the merchant ("No-Discount Rule"), or otherwise encouraging or "steering" the consumer to use one payment card product over another. Collectively, all of these restraints are referred to as "Anti-Steering Rules."

3. The public injunction sought in this action is designed to promote inter-brand competition, and thus to benefit the general public. In the absence of the Anti-Steering Rules, merchants could offer consumers incentives to use payment products that impose lower costs upon the merchant than do Amex-branded payment cards. If merchants were free to give consumers incentives to use less costly payment products, then Amex would face the prospect of losing consumers and would therefore be under pressure to reduce its merchant pricing. The Anti-Steering Rules, however, insulate Amex from such competition.

4. The public injunction sought in this case is also aimed at benefiting consumers. The Anti-Steering Rules ensure that merchants seeking to recoup the high prices they pay for

2

Amex acceptance are compelled to raise the prices of the goods and services they sell to *all* consumers, including cash-payers, debit card users, EBT card users, and those who would otherwise seek to avoid the high cost of such services. In the absence of the Anti-Steering Rules, and especially the No-Surcharge Rule, merchants would be free to pass the high price of Amex-card acceptance on to just those consumers who use Amex and they could thus charge a relatively lower price to customers who use a less expensive payment method.

5. Relatedly, the Anti-Steering Rules compel highly regressive and anticompetitive subsidies, running from the least affluent consumers to the most affluent consumers and large corporations. Because they prevent merchants from asking Amex-card users to cover the costs of Amex-card acceptance, the Anti-Steering Rules effectively compel users of other low-cost payment forms to subsidize all of the costly frequent flier miles, free gifts, cash-back rewards and other benefits enjoyed by holders of Amex rewards cards. Further, because the Anti-Steering Rules bar merchants from switching transactions to cheaper payment forms, merchants and their non-Amex customers must fund all of the substantial cash payments that Amex makes to big corporations in exchange for encouraging or mandating their executives to use American Express corporate cards for business expenses.

6. Finally, the Anti-Steering Rules flatly preclude merchants from seeking to compete with one another on the dimension of whether and how they price card acceptance services to consumers. Merchants compete every day on such dimensions as whether and how much to charge for parking, or whether and how to offer free wi-fi or free shipping. Just as merchants may compete on whether to discount Fed Ex service relative to UPS, they should also be free to compete on whether to discount Discover card acceptance relative to Amex card acceptance, or how much to charge for Amex card acceptance service. The Anti-Steering Rules prevent merchants from engaging in price competition with respect to the provision of payment card acceptance services. On their face, then, the challenged rules harm competition *among merchants*, quite apart from the harm they inflict upon competition in the payment services industry.

7. The object of this action—an Order from this Court preventing Amex from maintaining its Anti-Steering Rules with respect to merchants in the State of California—will promote competition among merchants and among credit card networks, and will benefit merchants, consumers and the general public. The relief sought here thus qualifies as a "public injunction" within the meaning of *McGill v. Citibank* (2017) 2 Cal.5th 945, which held that an agreement to waive a claim for a public injunction, even when embedded in an otherwise valid arbitration agreement, is unenforceable under California law. (See also *Blair v. Rent-A-Center* (9th Cir. 2019) 928 F.3d 819 [same].)

## JURISDICTION AND VENUE

8. This action for injunctive relief is brought pursuant to California Business & Professions Code sections 16750(a) and 17203. The action seeks to enjoin an ongoing violation of the Cartwright Act, Bus. & Prof. Code § 16720, and an ongoing unlawful business practice under the Unfair Competition Law, Bus. & Prof. Code § 17200.

9. Venue is proper in this judicial district pursuant to Business & Professions Code section 16750(a). Defendants maintain offices, transact business, have agents, and are otherwise found within the County of Los Angeles. Further, the public injunction sought in this action would benefit thousands of businesses located in this district and their customers, all of whom are injured by American Express's unlawful acts.

10. There is no federal jurisdiction over this public injunction action. Even where diversity jurisdiction otherwise exists, a federal court may not exercise jurisdiction in the absence of standing. A claim brought for the benefit of third parties will only confer standing to proceed in federal court if there exists an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. Class actions under Federal Rule of Civil Procedure 23 are one such exception—i.e., one such basis for third-party standing. Qui tam suits are another—and for this reason, many district courts have held that claims under the Public Attorney General Act, a type of qui tam statute, may proceed in federal court. But non-class public injunction actions do not qualify for any such exception and thus do not support the exercise of federal jurisdiction, even where diversity jurisdiction would otherwise apply.

11. For this reason, moreover, diversity jurisdiction is in fact lacking. Because there is no standing in federal court to prosecute this action except insofar as it seeks relief limited to Laurelwood Cleaners itself, the amount in controversy must be measured as the amount in dispute between Laurelwood Cleaners itself and American Express. Stripped of the cost to Amex of third-party relief, the amount in controversy between Laurelwood Cleaners and American Express is less than $75,000.

## ARBITRATION

12. Laurelwood Cleaners is party to a "Card Acceptance Agreement" with American Express which is unilaterally amended by Amex from time to time. As amended, the Card Acceptance Agreement contains an arbitration provision, under which Amex may demand that "any claim" be resolved in arbitration.

13. Under the operative arbitration provision, the arbitrator has "no right or authority" to award relief "on behalf of the general public [or] other merchants." Further, "the arbitrator's authority is limited to Claims between Merchant... and American Express," and any "arbitration award and any judgment confirming it will apply only to the specific case brought by Merchant... and cannot be used in any other case." And indeed, as the district court recently noted in *In re Am. Express Anti-Steering Rules Antitrust Litig.*, American Express has stipulated that its operative Card Acceptance Agreement "prohibits Plaintiffs from obtaining market-wide injunctive relief" in the arbitral forum. (2020 U.S. Dist. LEXIS 7095, at *24 (E.D.N.Y. Jan. 14, 2020).)

14. Thus, the arbitration agreement provides both that Amex may compel any claim against it to proceed in arbitration, and that the arbitrator may not award public injunctive relief. Consequently, "the arbitration provision purports to preclude [the merchant] from seeking public injunctive relief *in any forum.*" (*McGill*, 2 Cal.5th at 956.) The ban on public injunctive relief is therefore unenforceable. As the California Supreme Court held in *McGill*, "insofar as the arbitration provision here purports to waive [plaintiff's] right to request in any forum such public injunctive relief, it is invalid and unenforceable under California law." (*Id.* at p. 961.)

5
COMPLAINT FOR PUBLIC INJUNCTION

15. Nonetheless, in the event that American Express were to agree that an arbitrator may hear the instant action and is authorized to award the public injunctive relief sought in this Complaint, then Laurelwood Cleaners stands ready, willing and able to try the instant action in the arbitral forum.

## THE PARTIES

16. Plaintiff Laurelwood Cleaners, LLC is a family-owned limited liability company that is organized under California law and operates a dry-cleaning and laundry business in North Hollywood, California. Laurelwood Cleaners accepts all credit cards and, together with its predecessor, has done so since 1985. When a customer uses an American Express card for payment, the company pays roughly 3% of the transaction total in swipe fees. As a small dry-cleaning business in Los Angeles, Laurelwood's margins are slim and the swipe fees that it incurs comprise a very substantial portion of the company's profits.

17. Laurelwood Cleaners and its principal owner, Jonathan Ebrahimian, have long sought the freedom to pass on the costs of credit-card processing to those customers who choose to use credit cards. In the 1990s, Laurelwood charged a higher price to customers who used credit cards, which it expressed as an additional fee for credit-card use. However, it stopped imposing these fees after several months because it learned that the practice was not only contrary to the major card networks' rules but was illegal under California Civil Code section 1748.1, which forbade credit-card surcharging. Years later, after Visa and MasterCard rescinded their outright bans on credit-card surcharging, Laurelwood Cleaners was among a handful of merchants who brought suit challenging the constitutionality of Civil Code section 1748.1. The plaintiffs were victorious in federal district court and, in January 2018, the Ninth Circuit affirmed, holding the California anti-surcharging statute unconstitutional under the First Amendment. *Italian Colors Restaurant, et. al. v. Becerra* (9th Cir. 2018) 878 F.3d 1165.

18. Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

19. Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a

wholly-owned subsidiary of American Express Company. American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network.

## FACTUAL BACKGROUND

20. When a consumer presents an Amex-branded payment card for payment, the merchant swipes the card and transmits a record of the transaction to Amex. Amex then sends to the merchant's bank account an amount of money that is, generally speaking, equal to the transaction amount minus the "merchant discount fee" that Amex charges retailers. For a typical retailer in many industries, that discount fee is roughly 3% of the total transaction amount. At 3%, if a "Cardmember" (as Amex calls its cardholders) presents an Amex-branded payment card to make a $100 purchase, the merchant will receive $97 from Amex, and Amex will bill its Cardmember for $100.

21. Other payment products are far less costly to the merchant. Debit cards in particular carry much lower discount fees than Amex. As a result, if merchants were able to steer transactions to payment products other than Amex, they would realize significant savings. In a competitive retail marketplace, those savings will be passed along to all consumers in the form of lower everyday prices.

### *The Anti-Steering Rules*

22. There are many ways that merchants might steer transactions to less costly payment products, if they were permitted to do so. For example, the merchant might assign a price (or "surcharge") for using all credit cards, as opposed to debit cards. Or it might surcharge only Amex cards, or some subset of Amex-branded payment cards. Or it could offer a discount for using a different brand of credit card that is cheaper to the merchant. Merchants alternatively could verbally ask, or post signage asking, if customers would mind using a different payment product, as opposed to Amex cards. Or they may yet devise other techniques, once they are unconstrained by the anticompetitive rules against steering.

23. Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in <u>any</u> of these pro-competitive practices. As set forth in the "Merchant Reference Guide-U.S." that Amex publishes on its website,

"Merchants must not:

- indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card,
- try to dissuade Cardmembers from using the Card,
- criticize or mischaracterize the Card or any of our services or programs,
- try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check),
- impose any restriction, conditions, disadvantages or fees when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks,
- engage in activities that harm our business or the American Express Brand (or both), or
- promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes our Card."

24. The term "Other Payment Products" is defined to mean "any charge, credit, debit, stored value or smart cards, account access devices or other payment cards, services or products other than the [American Express] Card." Accordingly, a merchant may not offer a discount for the use of a card that is inexpensive to the merchant, if it does not also offer the same exact discount for the use of an Amex card, which is very expensive to the merchant. Nor may the merchant assess a charge for processing an American Express card transaction unless that merchant also imposes the same charge for processing all other card transactions, including even debit card transactions—something no merchant would ever consider, as debit transactions cost the merchant only a small fraction of what Amex transactions do.

25. The above iteration of Amex's Anti-Steering Rules, taken from the Merchant Payment Guide, is incorporated by reference or substantially mirrored in American Express' card acceptance agreements with all merchants in California and throughout the U.S.

*Anti-Competition Effects – In General*

26. The intended and actual result of Amex's Anti-Steering Rules is insulation from price-based competition at the point of sale in the payment card services markets. A competitor network—such as Discover or a new market entrant—may offer to provide comparable services to retailers at a price far lower than that charged by Amex. Such a pro-competitive strategy, however, will not allow this would-be competitor to gain any market share from Amex. The reason that the competitor network cannot gain market share by offering the same services at lower prices is because of the Anti-Steering Rules, which flatly ensure the consumer will have no incentive to use the less expensive and more efficient payment medium. The Anti-Steering Rules thus render Amex largely impervious to price-based competition at the point of sale.

27. In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex is able to charge merchants for processing transactions on the Amex payment card network would be greatly diminished. Merchants would incur lower fees and pass along the benefits to consumers in the form of lower prices.

28. Further, the abolition of the Anti-Steering Rules would enable merchants and their customers to avoid the cost of all the frequent flier miles, Membership Rewards Points®, travel insurance and other perquisites that are funded out of merchant discount fees. Presently, the benefits enjoyed by Amex Cardmembers are subsidized by all consumers and merchants. If the merchant were free to offer inducements to use less expensive payment forms—or, conversely, to assess a surcharge for using expensive payment products—then customers who nonetheless choose to use an expensive payment product, such as Amex, would pay for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at a two-dollar surcharge on her check-out ticket, the debit card user will be relieved of the obligation to subsidize that particular junket.

29.     Upon abolition of the No-Surcharge Rule in particular, evidence shows that California merchants will avail themselves widely of their new-found freedom to impose credit-card surcharges. For example, in the early 2000s, regulatory actions of the Reserve Bank of Australia forced Amex to rescind its ban on surcharging in that country. The practice of assessing surcharges did not take hold immediately. But within four years, some ten percent of Australian merchants were imposing surcharges on Amex transactions (whether on Amex only, or on Amex and other credit-card brands). And within a decade of the reforms, some 38.9% of mid-sized Australian merchants were engaged in credit-card surcharging, in one form or another, as were 50.6% of larger merchants. (See *In re Am. Exp. Anti-Steering Rules Antitr. Litig.*, 11-MD-2221 (E.D.N.Y.) ("*Amex ASR*") Doc. 370 at 5-6 [redacted expert report of Dr. Alan Frankel, citing report commissioned by the Reserve Bank of Australia].)

30.     All of this surcharging activity was impactful. During the ten-year period following the RBA reform, Amex's merchant fees dropped by roughly one-third. (*Id., Amex ASR*, Doc. 370 at 31 and fig. 6.) As a senior MasterCard economist explained, "[p]rice competition of payment systems for merchants is enhanced by the fact that surcharges [] are possible. . . . [T]he risk of increased surcharging after an increase of fees is one of the most powerful forces to keep merchant fees low." (*Id.*, at 28). The Reserve Bank and its consultants, moreover, concluded that "[t]he effect of lifting restrictions on merchant surcharging has seen cardholders refusing to absorb the higher costs of using their credit cards and increasingly opting for cheaper debit cards to make payments." (*Id.* at 26.)

31.     The Australian experience further underscores how, with the No-Surcharge Rule abolished, a merchant like Laurelwood Cleaners would be free to compete with other similar businesses on the dimension of whether to charge for Amex-card acceptance and, if so, how much to charge. At one point or another, many or most Australian businesses of the type and size of Laurelwood have imposed credit-card surcharges, and pricing of card-acceptance services is thus a distinct ground upon which these businesses compete. And the same is true in hotels, restaurants, rental cars, airlines and many other retail sectors.

*U.S. v. American Express Evidence*

32. Not only are the challenged rules likely to impair competition, but extensive evidence demonstrates that Amex's anti-steering rules have in fact harmed competition in the United States. Evidence adduced by the U.S. Justice Department, Antitrust Division, at a seven-week trial in 2015 demonstrated that, over the most recent five-year period for which data was available, "American Express raised the prices it charged merchants on 20 separate occasions" without ever taking "account of the possibility that large merchants would respond to the price increases by encouraging shoppers to use a different credit card because the [Anti-Steering Rules] prohibited any such steering." (*Ohio v. American Express* (2018) 138 S. Ct. 2274, 2293 (Breyer, J., dissenting) [summarizing findings in *United States v. American Express* (E.D.N.Y. 2015) 88 F. Supp. 3d 143].)

33. Merchant testimony showed that, "had it not been for those [anti-steering] provisions, the large merchants would have responded to the price increases by encouraging customers to use other, less-expensive cards." (*Id.*, 138 S. Ct. at 2293.) The "District Court also found that even though American Express raised its merchant prices 20 times in this 5-year period, it did not lose the business of any large merchant." (*Ibid.*)

34. The Government trial further demonstrated that Discover "tried to develop a business model that involved charging lower prices to merchants than the other companies charged," and it offered merchants powerful incentives "if they would steer customers to Discover." (*Ibid.* (quotations and citations omitted).) However, the district court found that these well-documented "efforts failed because of" the anti-steering rules. (*Ibid.*) The district court thus "found that the [anti-steering] provisions have limited or prevented price competition among credit-card firms for the business of merchants." (*Id.* at p. 2294.) And, as Justice Breyer noted, "this conclusion makes sense: In the [anti-steering] provisions, American Express required the merchants to agree not to encourage customers to use American Express' competitors' credit cards, even cards from those competitors, such as Discover, that intended to charge the merchants lower prices." (*Ibid.* (citations omitted).) Thus, "American Express has 'disrupt[ed] the normal price-setting mechanism' in the market." (*Ibid.* (citations omitted).)

35. "As a result of the [anti-steering] provisions," Justice Breyer observed, "competitors like Discover had little incentive to lower their merchant prices, because doing so did not lead to any additional market share. The provisions thereby suppressed American Express' competitors' incentives to offer lower prices, resulting in higher profit-maximizing prices across the network services market. Consumers throughout the economy paid higher retail prices as a result, and they were denied the opportunity to accept incentives that merchants might otherwise have offered to use less-expensive cards." (*Ibid.* (ellipses, brackets and quotations omitted).)

## MARKET POWER

36. American Express' actions harm competition in the market for credit-card acceptance services offered by payment card networks to merchants. Credit-card acceptance services form the product dimension of the relevant market applicable in this case, the geographic dimension of which may be regarded either as California (for purposes of this action) or the United States (more generally). American Express has substantial market power in the market for credit-card acceptance services.

37. Until the 2018 *Ohio v. American Express* decision, this common-sense market definition—often referred to as the market for general purpose credit and charge card services—applied under federal antitrust law as well. However, in a 5-4 decision authored by Justice Thomas and decided along partisan lines, a majority of the Supreme Court broke with longstanding antitrust principles and held that direct evidence of anticompetitive effects in the market for credit-card acceptance services is not sufficient to support liability. Rather, Justice Thomas's majority decision held, courts must look at whether the defendant has market power in a formally-defined "two-sided" market that includes the services offered by issuers to cardholders.

38. Conversely, for Justice Breyer and his three dissenting colleagues in *Ohio*, the findings of actual anticompetitive effects upon competition for credit card acceptance services—including the evidence referenced above concerning Discover's inability to increase volume by

lowering rates—were ample to support antitrust liability: "I should think that . . . there is little more that need be said." (*Ibid.*) As Justice Breyer explained, all of this direct evidence of anticompetitive effects obviated any need to define a relevant market. Instead, Justice Breyer embraced the "quick look" variant of rule of reason analysis—a doctrine that has deep roots in California antitrust law. (See *In re Cipro Cases I & II* (2015) 61 Cal.4th 116, 146-47. Under quick look, Justice Breyer reasoned, "a discussion of market definition was legally unnecessary . . . because the District Court found strong direct evidence of anticompetitive effects flowing from the challenged restraint." (*Id.* at p. 2295; accord, *In re Cipro*, 61 Cal.4th at 147.) And since the whole "purpose of [] inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for those inquiries." (*Amex*, 138 S. Ct. at 229; accord, *In re Cipro*, 61 Cal.4th at 147.)

39. To the extent it is useful to define a relevant product market, Justice Breyer further observed, that market consists of the credit-card *acceptance* services marketed to merchants, and does not include the wholly distinct services that are sold to cardholders. "[M]erchant-related card services and shopper-related card services," he explained, are "complements," like "gasoline and tires. A driver needs both gasoline and tires to drive, but they are not substitutes for each other, and so the sale price of tires does not check the ability of a gasoline firm (say a gasoline monopolist) to raise the price of gasoline above competitive levels." (*Ibid.*) For this reason, leading antitrust commentators understand that "[g]rouping complementary goods into the same market is economic nonsense." (*Id.* at pp. 2295-2296 (quoting 2B P. Areeda & H. Hovenkamp, Antitrust Law ¶565a, at 431(4th ed. 2013).)

40. Justice Breyer's analysis in *Ohio v. American Express* is rooted in principles that are firmly established in longstanding California antitrust law. California antitrust law is in accord with Justice Breyer's dissent, and not with the majority decision of Justice Thomas.

41. American Express has and exercises substantial market power in the market for credit-card acceptance services. But even if one were to define a relevant product market as

consisting of *both* the services provided to merchants *and* the services provided to cardholders, American Express would likewise have substantial market power in that two-sided market.

## INJURY IN FACT

42. Plaintiff Laurelwood Cleaners has suffered injury in fact and has lost money or property as a result of the unfair competition and antitrust violations that are the subject of this Complaint. Among other things, in the absence of the Anti-Steering Rules, Laurelwood Cleaners would be more readily able to steer customers to use cheaper means of payment and American Express's discount rates would be lower. Discount rates would also be lower on the Visa, MasterCard and Discover credit-card networks because those brands would seek to give merchants an incentive to steer volume away from American Express and towards them.

43. Laurelwood Cleaners continues to accept American Express, as it must in order to service a large segment of its clientele. Thus, as one of hundreds of thousands of Amex-card accepting merchants in the State of California, Laurelwood Cleaners stands to benefit from the public injunction sought by this action.

## FIRST CLAIM FOR RELIEF

(For Violation of the Cartwright Act, Bus. & Prof. Code § 16700 et seq.)

44. Plaintiff incorporates by reference the foregoing allegations.

45. The Anti-Steering Rules, which are incorporated in all or substantially all American Express's contracts with merchants, represent an unlawful restriction in trade or commerce under Business and Professions Code section 16720(a).

46. The Anti-Steering Rules represent a vertical restraint that has had and continues to have the clear effect of restraining inter-brand (i.e., horizontal) competition among credit-card networks in the market for credit-card acceptance services.

47. The Anti-Steering Rules outright preclude price-based competition among merchants on the dimension of whether and how to price credit-card acceptance services to customers.

48. The No-Surcharge Rule is a vertical price restraint and form of vertical price fixing that is *per se* illegal.

49. There exists "strong direct evidence of anticompetitive effects flowing from the challenged" Anti-Steering Rules and the No-Surcharge Rules, and those rules are therefore illegal under the "quick look" variant of the rule of reason, as well as under the rule of reason generally.

50. The Anti-Steering Rules serve no procompetitive purpose that could justify the imposition of the challenged restraints.

51. As a direct and foreseeable result of American Express' willful imposition of the Anti-Steering Rules, California merchants have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law, and which is likely to continue if not enjoined.

## SECOND CLAIM FOR RELIEF

(For Violation of the Unfair Competition Law, Bus. & Prof. Code § 17200 et seq.)

52. Plaintiff incorporates by reference the foregoing allegations.

53. American Express's maintenance and imposition of the Anti-Steering Rules constitutes an "unlawful" business practice, within the meaning of Business & Professions Code section 17200, because those rules violate the Cartwright Act, as set forth above.

54. This action seeks "such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition," within the meaning of Business & Professions Code section 17203.

WHEREFORE, plaintiff respectfully seeks:

A. A public injunction, enjoining American Express from continuing to impose its Anti-Steering Rules upon California merchants;

B. An Order directing the award of costs and fees; and

C. Such other relief as this Court deems just and proper.

Dated: February 25, 2020

MARKUN ZUSMAN FRENIERE & COMPTON LLP

By: _____
Edward S. Zusman (SBN 154366)
Kevin K. Eng (SBN 209036)
465 California Street, Suite 401
San Francisco, CA 94104
Tel: (415) 438-4515; Fax: (415) 434-4505
ezusman@mzclaw.com; keng@mzclaw.com

15

Robert W. Cohen (SBN 150310)
Mariko Taenaka (SBN 273895)
LAW OFFICES OF ROBERT W. COHEN, P.C.
1901 Avenue of the Stars, Suite 1900
Los Angeles, CA 90067
Tel: (310) 282-7586; Fax: (310) 282-7589
rwc@robertwcohenlaw.com
mt@robertwcohenlaw.com

Of Counsel:
Gary Friedman (pro hac vice forthcoming)
154 Grand Street
New York, NY 10013
Tel: (917) 568-5024
gfriedman@flgllp.com